**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**CHRISTOPHER M. BATTEN,**

     **Plaintiff,**

**vs.**                             **CIVIL ACTION NO. 2:16-00997**

**CAROLYN W. COLVIN
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered January 29, 2016 (Document No. 3.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 8 and 9.)

The Plaintiff, Christopher M. Batten (hereinafter referred to as "Claimant"), protectively filed his application for Title II benefits on July 27, 2012, alleging disability beginning December 31, 2010 due to "PTSD, depression, general and social anxiety, right shoulder, hearing loss, irritable bowel syndrome, diverticulitis, cyst on right kidney".[1] (Tr. at 225.) His claim was denied on September 25, 2012 (Tr. at 82-86.) and again upon reconsideration on November 26, 2012. (Tr.

---

[1] In his Disability Report – Appeal, dated December 11, 2012, Claimant alleged that since November 1, 2012, he was having more shoulder problems and was more depressed and anxious. (Tr. at 247.)

at 90-92.) Thereafter, Claimant filed a written request for hearing on December 12, 2012. (Tr. at 93-94.) An administrative hearing was held on September 10, 2014[2] before Administrative Law Judge ("ALJ") Sabrina M. Tilley. (Tr. at 29-49.) The ALJ heard the testimonies of Claimant (Tr. at 32-43.) and Vocational Expert ("VE") Nancy Shapero. (Tr. at 43-49.) On September 26, 2014, the ALJ entered a decision finding Claimant was not disabled. (Tr. at 8-28.)

The ALJ's decision became the final decision of the Commissioner on November 30, 2015 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6.) On November 23, 2015, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1381. (Document No. 1.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c).

---

[2] Initially, the administrative hearing was held on April 4, 2014, however, because Claimant's representative was waiting on outstanding medical records and the ALJ planned to schedule both a physical and psychological evaluation on Claimant, the hearing was continued; Claimant did not testify during this initial hearing. (Tr. at 50-55.)

If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 404.1520(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and

3

how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

In this particular case, the ALJ determined that Claimant last met the requirements for insured worker status through December 31, 2014. (Tr. at 13, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date of December 31, 2010. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: irritable bowel syndrome; diverticulitis; internal derangement of the right shoulder; and generalized anxiety disorder. (Tr. at 14, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 4.) Next, the ALJ found that Claimant had a residual functional capacity ("RFC") to perform light work as defined in the Regulations:

In addition, he could occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds. He could occasionally balance, stoop, kneel, crouch, and crawl. He could perform no overhead reaching with the right upper extremity, could have only occasional exposure to extreme cold, extreme heat, vibrations, loud noise and hazards. He retains the capacity to understand, remember, and carry out simple instructions; and respond appropriately with occasional interaction with coworkers, and supervisors. He could have no interaction with the general public. He could make an adjustment to occasional changes in work routine. Work environment should not consist of fast-paced production requirements. (Tr. at 16, Finding No. 5.)

At step four, the ALJ found that Claimant was incapable of performing past relevant work. (Tr. at 22, Finding No. 6.) At step five of the analysis, the ALJ found that having been born on November 23, 1977 and 33 years old, Claimant was a younger individual on the alleged onset date. (Id., Finding No. 7.) The ALJ found that Claimant had at least a high school education and was able to communicate in English. (Id., Finding No. 8.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled though the date last insured, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and residual functional capacity indicated that there were other jobs existing in significant numbers in the national economy that Claimant could have performed. (Id., Finding Nos. 9 and 10.) On that basis, the ALJ found Claimant was not disabled from December 31, 2010 through the date of the decision. (Tr. at 23, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Issues on Appeal[4]

The grounds of alleged error presented by Claimant in his appeal are: (1) whether the ALJ's step five finding is inconsistent with the VE's testimony, and therefore not supported by substantial evidence; and (2) whether the ALJ erred by failing to include limitations in the RFC which were found by the psychological consultative examiner, Cynthia Spaulding, M.A., whose opinion the ALJ gave great weight. (Document No. 8 at 7.)

Claimant's Background

At the time of the alleged onset date through the date of the ALJ's decision, Claimant was considered a "younger individual". (Tr. at 22.) See 20 C.F.R. § 404.1563(c). He completed three years of college and had additional training in air craft tech maintenance in the Air Force. (Tr. at

---

[4] Prior to the Appeals Council denying Claimant's request for review, and nearly a year after the ALJ's decision, Claimant submitted additional medical evidence. (Tr. at 893-911.) This evidence included records from Clarksburg VAMC dated May 7, 2014 through July 21, 2015 concerning treatment for Claimant's allergies and other physical complaints; Claimant does not rely upon this evidence in his appeal or as a challenge to the Appeals Council decision.

226.) His past relevant work experience included telemarketer[5], data entry, broad band representative, and used car salesman. (Id.)

The Relevant Evidence of Record[6]

Department of Veterans Affairs ("VA") Records:

A record dated March 10, 2010 indicated that Claimant "first noticing trouble with anxious feelings in 2003". (Tr. at 859-860.) He complained of anxiety and nerves, and he reported that he had not used marijuana in 2 years. (Tr. at 861.) Kelly Cummings, MS, PA-C, found Claimant's mood "okay," with an appropriate affect and no flight of ideas, loosening of associations, hallucinations, delusions, paranoia, or suicidal or homicidal ideation. (Tr. at 861-862.) Ms. Cummings diagnosed Claimant with generalized anxiety disorder; depressive disorder, not otherwise specified (NOS); and substance overuse, by history; and she assigned him a global assessment of functioning (GAF) score of 55.[7] (Tr. at 862.)

Claimant underwent a trial of Prozac, and returned in June 2010 in a euthymic mood. (Tr. at 857, 862.) Ms. Cummings noted at that time that Claimant's attention and concentration were intact. (Tr. at 857.) Claimant did not return to Ms. Cummings until November 2011, at which time he admitted not having been compliant with the prescribed use of Prozac in 2010. (Tr. at 834.) He admitted that the reason for his noncompliance had been that he was using marijuana. (Id.) By this

---

[5] Claimant alleged having worked in this position very briefly, from July 23, 2012 to July 27, 2012. (Tr. at 226.)

[6] Because Claimant's appeal only concerns the ALJ's treatment of his mental impairments, the undersigned focuses on the relevant evidence of record pertaining to same as submitted by the parties in their respective pleadings.

[7] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

time, Claimant complained of more frequent anxiety attacks; he had a mild panic attack the day before, though he was able to redirect his attention to account for it. (Id.) Ms. Cummings found Claimant's mood dysphoric, and his affect was mildly blunted, but he was alert and oriented. (Tr. at 836.) His cognition was intact, his insight was fair, his judgment was adequate, and he had no flight of ideas, looseness of associations, delusions, paranoia, hallucinations, or suicidal or homicidal ideation. (Id.) Ms. Cummings assigned Claimant a GAF score of 55 and explained to him the importance of staying clean and sober. (Tr. at 837-838.) Claimant also received Prozac for a new trial of the medication. (Tr. at 837.)

By the time Claimant returned in January 2012, he had reduced his marijuana intake significantly (Tr. at 648.), and he reported that Prozac had helped him be more calm and less irritable. (Tr. at 647.) He rated his mood as 8 out of 10. (Id.) Ms. Cummings reported that Claimant was alert and oriented, his mood was "pretty good," and his affect was appropriate to mood (though he was tearful as he spoke of survivor guilt related to his military service, but he was able to console himself easily). (Tr. at 648.) Ms. Cummings observed that his insight was fair, his judgment was adequate, and he had no flight of ideas, looseness of associations, delusions, paranoia, hallucinations, or suicidal or homicidal ideation. (Id.) Ms. Cummings assigned Claimant a GAF score of 60. (Id.)

In April 2012, Claimant contacted Ms. Cummings by telephone to report that his anxiety had increased, as he realized his unemployment benefits were due to run out. (Tr. at 458.) He stated that he largely had been sober, though every once in a while would relapse into cannabis; he denied suicidal or homicidal ideation. (Id.) In June 2012, Claimant was arrested after a fight with his wife. (Tr. at 453.) His marijuana intake had increased to use on a daily basis, and he reported post-

traumatic stress disorder (PTSD) symptoms; his main stressor was the impending court date concerning the domestic matter as well as unemployment. (Tr. at 454.) Ms. Cummings found on examination that Claimant's mood was anxious; his affect was appropriate and congruent with his mood; his insight was low; he remained alert and oriented; his cognition was intact; and he had no flight of ideas, loosening of associations, hallucinations, delusions or paranoia. (Id.) Ms. Cummings assigned Claimant a GAF score of 55 and recommended a trial of propranolol for anxiety attacks. (Tr. at 455.)

Claimant subsequently reported to Ms. Cummings on July 30, 2012 that the propranolol was helpful in minimizing his anxiety. (Tr. at 387.) He stated that using medications, rather than marijuana, on a regular basis was helpful; Ms. Cummings advised that marijuana could render his medications less effective and destabilize his mood. (Id.) Claimant's mood reportedly was "okay," and his affect was appropriate; Ms. Cummings found that his insight was fair, his judgment was adequate, and he had no flight of ideas, looseness of associations, delusions, paranoia, hallucinations, or suicidal or homicidal ideation. (Tr. at 388.) Ms. Cummings assigned Claimant a GAF score of 58. (Id.) Later, in September 2012, Claimant reported to Elizabeth Powers, M.D., his primary care physician, that his mood was "up and down". (Tr. at 475.)

Claimant returned to Ms. Cummings on October 2, 2012 reporting that he had been clean and sober since July, and he rated his mood a 7 out of 10. (Tr. at 471.) His mood reportedly was "neutral," and his affect was appropriate to mood and non-labile; his insight was fair, his judgment was adequate, and he had no flight of ideas, looseness of associations, delusions, paranoia, hallucinations, or suicidal or homicidal ideation. (Id.) Ms. Cummings assigned him a GAF score of 60. (Tr. at 472.)

In November 2012, Janis Boury, Ph.D., examined Claimant for a Mental Health C&P Examination Consult due to his application to the VA for disability benefits. (Tr. at 524-541.) Dr. Boury found his mood depressed, although Claimant reported that his temper was better and control his anger better. (Tr. at 535-536.) Dr. Boury assigned Claimant a GAF score of 58. (Tr. at 526.) Claimant reported continuing panic attacks to Ms. Cummings on November 19, 2012, but he stated that with treatment, he considered the condition mild. (Tr. at 519.) Ms. Cummings found his mood "okay"; his affect was appropriate to mood; his insight was fair; his judgment was adequate; and he had no flight of ideas, looseness of associations, delusions, paranoia, hallucinations, or suicidal or homicidal ideation. (Tr. at 520.) Ms. Cummings assigned Claimant a GAF score of 60. (Id.) The following month, Dr. Powers reported that Claimant's affect was euthymic, reactive, and appropriate. (Tr. at 515.)

In March 2013, Claimant admitted that he had been "hit and miss" regarding compliance with his medication. (Tr. at 698.) As a result, Ms. Cummings reported his symptoms included dysphoria, decreased interest, and anxiety. (Id.) She also reported that Claimant could redirect his attention in the event of a panic attack. (Id.) On examination, Claimant's mood was dysphoric, with a blunted affect, but he was alert and oriented; his insight was fair, his judgment was adequate, and he had no flight of ideas, looseness of associations, delusions, paranoia, hallucinations, or suicidal or homicidal ideation. (Tr. at 700.) Ms. Cummings assigned Claimant a GAF score of 55. (Tr. at 701.)

State Agency Psychological Consultants:

On September 20, 2012, Jim Capage, Ph.D., reviewed Claimant's medical records and opined that Claimant experienced a mild restriction in his activities of daily living; moderate

11

deficiencies in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. (Tr. at 60.) Dr. Capage opined that Claimant retained the RFC to "perform routine work-related activities in settings that keeps change to a minimum and permits solitary work activity with no more than occasional and superficial social interaction[;] [t]asks should be low-stress with no supervisory responsibilities and no fast-paced production requirements." (Tr. at 65.)

On November 5, 2012, Karl G. Hursey, Ph.D., independently reviewed Claimant's medical record and opined that he had a mild restriction in his activities of daily living; moderate deficiencies in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. (Tr. at 73.) Dr. Hursey rated Claimant's ability to maintain attention and concentration for extended periods as "Not significantly limited". (Tr. at 77.) He opined that Claimant retained the mental and emotional capacity to carry out simple, routine tasks, within the limitations he had identified "above," in his report. (Tr. at 78.)

John Atkinson, Jr., M.A.:

On April 28, 2014, John Atkinson, Jr., M.A. examined Claimant, and reported a variable presentation: Claimant "was getting very agitated, open and emotional and at other times cynical about everything in life." (Tr. at 806.) Claimant's attention span and concentration were normal. (Id.) Mr. Atkinson further reported that Claimant's mood was reportedly "scattered" and that his usual mood "depends on the day"; he had a somewhat labile affect with crying. (Id.) It was noted that Claimant's insight was limited, he was oriented to three spheres, his memory was broadly intact "although somewhat spotty as to specifics", his associations were relevant, his stream of thought was normal, and his judgment was average. (Tr. at 806-808.) Claimant admitted that he

had continued to abuse marijuana in place of his psychotropic medication; he stated that he felt marijuana had a more calming effect than the other medications. (Tr. at 808.) Mr. Atkinson diagnosed Claimant: mood disorder, NOS, to include major depression with psychotic potential; mixed anxiety disorder with generalized anxiety and panic disorder with agoraphobic features; and a possible substance abuse component (although deemed not significant to his presentation) claimed as generalized anxiety disorder; and that Claimant satisfied the criteria for PTSD. (Id.) Mr. Atkinson assigned Claimant a GAF score of 47.[8] (Tr. at 809.)

State Agency Psychological Examiner:

On May 13, 2014 Claimant was given a clinical interview and mental status examination by Cynthia Spaulding, M.A. (Tr. at 810-815.) Ms. Spaulding found Claimant's mood anxious and depressed, and his affect was restricted; but he was fully oriented; his immediate and remote memory were normal (while his recent memory was moderately impaired); his judgment was within normal limits; and his social functioning was mildly impaired. (Tr. at 813-814.) Ms. Spaulding further reported that Claimant's attention span was within normal limits, and his capacity for persistence was normal. (Id.) Psychologist Spaulding made the following diagnoses: post-traumatic stress disorder; major depression, recurrent, moderate; and cannabis use disorder, moderate. (Tr. at 814.) She concluded that Claimant's prognosis was guarded. (Tr. at 815.)

Ms. Spaulding also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)". (Tr. at 816-818.) On that form, the psychologist noted that Claimant had moderate limitations in his ability to understand, remember, and carry out complex instructions,

---

[8] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 41-50 indicates that the person has "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

and that he had marked limitations in his ability to make judgments on complex work related functions; she attributed these limitations to the fact that Claimant's "post-traumatic stress disorder & mood symptoms adversely affect judgment and concentration". (Tr. at 816.) Psychologist Spaulding also opined that Claimant had moderate limitations in interacting appropriately with the public and co-workers, and in responding appropriately to usual work situations and to changes in routine work settings. (Tr. at 817.) Further, Ms. Spaulding found that Claimant had marked limitations in interacting appropriately with supervisors. (Id.) She based that opinion on Claimant's "affective instability, hyper-vigilance, poor anger control, panic attacks". (Id.) "Marked" was defined in the form as "There is a serious limitation in this area. There is a substantial loss of ability to effectively function". (Tr. at 816.)

The Administrative Hearing

Claimant Testimony:

Claimant testified that he had worked since December 31, 2010; he stated that he worked for JAK Productions but was only there two days. (Tr. at 32-33.) He testified that it was a telemarketing job with a lot of noise around and on the second day his anxiety was so bad that he went into a restroom for about forty-five minutes and ultimately told a supervisor that he could not do the job and walked out. (Tr. at 34-35.) He testified that his job as a broad band rep for a cable company involved taking calls from customers. (Tr. at 44.)

Claimant testified that at one time he had taken Prozac and other medications for his mental conditions, prescribed by his VA doctors, but he got to the point where he could not function and "was a zombie" so he quit taking the medications. (Tr. at 35-36.) He testified that he used marijuana to keep himself positive and his mood right. (Tr. at 36.) He stated that it kept him normal

"unlike the prescription pills they were giving me from the VA." (Id.) He testified that marijuana helped with his depression, his anxiety, and his diverticulitis when it flared up. (Id.) Claimant stated that he still had some problems with anxiety even with using marijuana to treat his symptoms; he stated that he had panic attacks at least once a week. (Tr. at 36-37.) He stated that his panic attacks were brought on by "anything and everything" such as being in public or any uncomfortable situation. (Tr. at 37.) He testified that it took him ten to thirty minutes to get over a panic attack. (Id.) Claimant stated that he did not handle stress very well and he would shut down; he stressed out about even small things. (Id.) He testified that his anxiety kept him from going places and interacting with people. (Tr. at 35.) He stated, "There's times when I go out places and I have to leave because I can't take the anxiety from people around me, and being in public." (Id.) He also testified that he had trouble with concentration in that "sometimes my minds a thousand miles an hour, and I can't seem to concentrate on one thing or very long." (Tr. at 37.)

Claimant testified that his post-traumatic stress disorder ("PTSD") caused depression, anxiety, stress, hypervigilance, and bad dreams. (Id.) He stated that his ability to relate to other people in social situations seemed to vary. (Tr. at 38.) He described going to his son's sporting events and the crowd around making him feel agitated. (Id.) He stated that as a consequence he got mad and yelled and he had been thrown out of four or five of his son's games because he could not control himself. (Id.) He stated that he was hyper-vigilant all the time and that he could not go out in public places without having his "head on a swivel, looking around me, paying attention to things, paying attention to people." (Id.)

Claimant stated that he had two torn labrum in his right shoulder which had not been repaired and the pain had gotten worse as he had gotten older. (Id.) He stated that he was unable to pick up

his daughter who weighed forty to forty-five pounds. (Id.) Claimant testified that he had pain in his shoulder all the time. (Tr. at 39.) He stated that throwing baseballs for his son made the pain much worse. (Id.) He testified that he also had back pain and pain from his shoulder up into his neck. (Tr. at 40.) Claimant stated that the heaviest weight he could lift was probably fifteen pounds, and that was pushing it. (Tr. at 42.)

Claimant testified that he had symptoms of irritable bowel syndrome on a daily basis; he noted that from the time he got up at 7 a.m. until noon he used the bathroom four times. (Tr. at 39.) He stated that he watched what he ate, but he believed the symptoms were primarily caused by stress. (Id.) Claimant stated that when he had the urge to use the restroom he had to go urgently, without much time to get to the restroom. (Id.)

Claimant testified that he also had tinnitus and had ringing in his ears constantly. (Tr. at 40.) He stated that sometimes the ringing was louder than at other times and sometimes he had a sound like a digital tick in his ears. (Id.) Claimant testified that the ticking was more distracting to him than the ringing because he also had pain with the ticking. (Id.) He stated that the ringing interfered with being able to hear and sometimes he had to ask people to repeat themselves three times. (Id.) He stated that he had trouble sleeping at night due to the ringing in his ears and due to dreaming a lot. (Tr. at 41.)

Claimant testified that he lived with his wife and two children, ages thirteen and five. (Id.) He stated that he helped with housework as he was able, but washing dishes caused his shoulder to hurt and he could not carry a laundry basket upstairs. (Id.) He stated that he went grocery shopping with his wife, but she did most of it and he just followed her around. (Tr. at 42.) He stated that being in the grocery store bothered him depending on crowded and how noisy it was. (Id.)

16

Claimant stated that he liked to cook on the grill, but tended to burn steaks because his mind drifted. (Id.)

Claimant described a typical day as taking his kids to school if he could get up in time and then "hibernating" until it was time to pick them up. (Id.) He stated that he did not do much although some days he felt the need to get out of the house so he would leave for half an hour and then return back home. (Id.)

Vocational Expert ("VE") Nancy Shapero Testimony:

The VE testified that Claimant's past work as a cable representative was sedentary, skilled work; his work as a data entry clerk was sedentary, semi-skilled work; his work as a delivery driver was medium semi-skilled work; his work as a telemarketer was sedentary semi-skilled work; and his work as a used car salesperson was light skilled work. (Tr. at 45.) She stated that Claimant would have acquired no transferable skills from any of his past jobs. (Id.)

The VE testified that an individual of the same age and with the same education and work experience as Claimant who was limited to lifting twenty pounds occasionally and ten pounds frequently; who could stand and walk six hours in an eight hour day; who could sit at least six hours in an eight hour day; who could occasionally climb ramps and stairs; who should never climb ladders, ropes, and scaffolds; who could occasionally balance, stoop, kneel, crouch, and crawl; who should not perform over-head reaching with the right upper extremity; who could have only occasional exposure to extreme cold, extreme heat, vibrations, loud noise, and hazards; who retained the capacity to understand, remember, and carry out simple tasks; who could respond appropriately to occasional interaction with coworkers and supervisors so long as such activity did not include teamwork or over the shoulder supervision; who should have no interaction with the

general public and would be able to make an adjustment to occasional changes in the work routine, would be unable to perform any of Claimant's past relevant work. (Tr. at 45-46.) The VE testified that the above individual would be able to perform light jobs such as mail clerk, non-postal; assembler; and price marker. (Tr. at 46.)

In response to questions from Claimant's representative, the VE testified that if the above hypothetical person was also limited to never interacting with supervisors there would be no jobs that the individual could perform. (Tr. at 48.) She stated that if the individual required occasional unscheduled breaks outside of the regularly schedule breaks and lunch, which would last from five minutes to half an hour, there would be not work that could be performed if that occurred on a regular and consistent basis. (Id.) The VE testified that if the individual was off task consistently at least fifteen percent of the time that would also rule out any jobs. (Tr. at 49.)

Claimant's Challenges to the Commissioner's Decision

Claimant contends that the ALJ's RFC assessment is inconsistent with the hypothetical she posed to the VE, and is therefore not supported by substantial evidence. (Document No. 8 at 8.) Specifically, Claimant states that the restriction to work environments to exclude fast-paced production requirements in her RFC was not included in the hypothetical to the VE. (Id. at 8-9.) Claimant argues that the testimony of the VE is only relevant and can only serve as substantial evidence so long as it is based upon all other evidence of record pursuant to Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). (Id. at 10.) In addition, Claimant argues that the ALJ's hypothetical to the VE failed to include the "marked" limitations in Claimant's ability to interact appropriately with supervisors as found by State agency psychological examiner Cynthia Spaulding, whose opinion was afforded "great weight" by the ALJ. (Id. at 11-12.) Claimant argues that the ALJ's

disregard for his representative's additional limitation in the hypothetical to the VE, that he could not interact with supervisors, was incorrect because such a limitation was supported by the credible evidence of record. (Id. at 12.) Claimant argues that the Fourth Circuit has held that where an ALJ fails to account for limitations in an RFC assessment or fails to explain why same is unnecessary, remand is appropriate. Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015) (Id. at 12-14.)

The Commissioner responds that the ALJ's decision is based on substantial evidence and that apparently, the RFC finding included a typographical error because the hypothetical to the VE omitted the fast-paced production requirements, but even if it is not, the error is harmless. (Document No. 9 at 11.) The Commissioner contends that the typographical error is clear by the ALJ's discussion of the findings of the State agency experts: Dr. Capage described a restriction against fast-paced production requirements, whereas Dr. Hursey did not. (Id. at 12-13.) Further, the Commissioner states that the ALJ expressly declined to adopt the portion of Dr. Capage's findings that precluded fast-paced production requirements. (Id. at 14.) The Commissioner points out that during several appointments Claimant had during the relevant time period, he was repeatedly found to have intact concentration, attention, and cognitions by Ms. Cummings, Mr. Atkinson, and even Ms. Spaulding. (Id.)

The Commissioner states that if the typographical error was erroneously omitted from the hypothetical to the VE, such an error is harmless in this case because the record supports the ALJ's decision, and would not have changed the outcome of this case.[9] (Id. at 15-17.) The Commissioner

---

[9] See generally, Bishop v. Comm'r of Soc. Sec., 583 F.App'x 65, 67 (4th Cir. 2014) ("[E]ven assuming Chenery is applicable, any error is reviewed under the harmless error doctrine. Thus, if the decision 'is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.'" (quoting Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010)); Bryant v. Colvin, 571 F.App'x 186, 190 (4th Cir. 2014) ("We . . . find the ALJ errors harmless and affirm the ALJ's determination of Bryant's RFC.")

points out that two of the jobs the VE identified would be consistent with a restriction against fast-paced production requirements, and this Court found the mail clerk position consistent with restrictions against production-paced work: See Hampton v. Colvin, 2015 WL 5304294, at *29 n.14 (S.D.W.Va. Aug. 17, 2015) ("[A]t least two of the jobs identified by the ALJ [including mail clerk], do not require the ability to engage in fast-paced production."); Sanford v. Colvin, 2015 WL 5565896, at *3 (S.D.W.Va. Aug. 31, 2015) (recommending affirmance of decision where claimant "would not be able to engage work with fast pace or strict production requirements" and VE identified price marker position); Cline v. Colvin, 2015 WL 1133631, at *4 (S.D.W.Va. Mar. 12, 2015) (recommending affirmance of decision where claimant was "limited to work without specific production quotas or a rapid pace . . . On the basis of testimony of a [VE] taken at the administrative hearing, the ALJ concluded that claimant could perform jobs such as a . . . price marker, at the unskilled, light level of exertion"). (Id. at 15-16.)

Next, the Commissioner states that the ALJ's evaluation of Ms. Spaulding's opinion complied with the Regulations; just because she gave "great weight" to the opinion, does not necessary require her to adopt each and every limitation therein. (Id. at 18-19.) The Commissioner argues that Ms. Spaulding's "largely unexplained checkbox form" finding Claimant's marked limitations was "incongruous" with her findings that were consistent with the medical evidence of record. (Id. at 19.) Finally, the Commissioner argues that Claimant's reliance on Mascio v. Colvin is inapposite here because the ALJ in this case did not overlook evidence and incorporated Claimant's restrictions in her RFC assessment appropriately. (Id. at 19-20.)

In reply, Claimant argues that the Commissioner's invitation to this Court to make alternate findings in the ALJ's decision is prohibited, and further the Commissioner's *ad hoc* reasoning of

what the ALJ intended in her RFC finding is assumptive. (Document No. 10 at 1-2.) The ALJ's decision violated the Regulations necessitating remand. (Id. at 2.) Further, Claimant argues that Ms. Spaulding's opinion that Claimant had marked restrictions in his ability to interact with supervisors was a functional assessment, not an RFC assessment, and that remand is required in order to allow the ALJ to asses or consider that limitation or explain why such a limitation was not credited, although all other aspects of Ms. Spaulding's opinion were.[10] (Id. at 3-4.)

Analysis

In the first alleged ground of error, Claimant contends the RFC assessment is inconsistent with the RFC hypothetical posed to the VE, and as a result, is not supported by substantial evidence. This argument stems from the last sentence the ALJ provided in her RFC: "Work environment should not consist of fast-paced production requirements." (Tr. at 16.) The Commissioner points out several decisions from this district that included RFC assessments where a claimant was limited to work without production quotas or fast-paced, that the resulting jobs available included both "price marker" and "mail clerk", two of the jobs identified by the VE in the case at bar. Therefore, the question presented is whether the omission of this last sentence from the hypothetical posed to the VE is improper under Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). The Fourth Circuit has held that a VE's opinion is "relevant or helpful" if it is "based upon a consideration of all other evidence in the record", and is given "in response to proper hypothetical questions which fairly set out all of a claimant's impairments." (Id.) It is important to examine the hypothetical that caused remand in the Walker case[11]:

_____

[10] Claimant argues that the Commissioner's only in Circuit case cited in support of her argument as having no factual relevance to the case at bar.

[11] The Court noted that the vocational expert was called to testify primarily about the claimant's transferable skills, a critical issue to the disability determination due to the claimant's "advanced age" status. Id., n.2.

The [vocational] expert testified that the claimant's former employment as a bricklayer gave him two transferable skills—the ability to use small tools and a knowledge of construction principles. He testified that these skills would be transferable to jobs such as termite treater, termite treater helper, surveyor helper or drywall applicator. The vocational expert testified that these jobs required light or medium exertion.

The ALJ then asked the following questions of the vocational expert:

Q:    If Mr. Walker was limited to [per]forming sedentary work, would he be able to transfer any of the prior skills to any sedentary jobs?

A:    The ability to use small tools would be transferable ... to jobs that are in bulk called assembly jobs. Assemblers—there are about 1,400 such jobs in the City of Richmond. About 20,000 throughout the State of Virginia. These are jobs where people use small tools to assemble in some cases automobile parts, parts dealing with electrical appliances such as fans, and other small items.

————————————

Q:    Mr. Walker has told us about a number of health problems that cause him functional limitations and subjective distress, too. If I found all of his testimony to be credible and supported by the medical evidence, how would that affect his ability to do the types of jobs you've discussed with me.

A:    In my opinion ... it would effectively preclude him from doing any of the jobs that I've enumerated.

The Court found that these questions were improper; there was no indication that the vocational expert therein knew about the claimant's abilities and limitations, therefore, those answers were deemed "not particularly useful." Id. at 50-51. Moreover, the Court found that the ALJ therein improperly evaluated the claimant's complaints of pain, and did not evaluate the effect of the alleged pain in the RFC, which rendered the ALJ's decision that the claimant had the capacity for the full range of sedentary and light work was not significantly compromised by any non-exertional limitations. Id., See also, Rogers v. Colvin, 2015 WL 1482014, at *10 (S.D.W. Va. Jan. 30, 2015).

In this case, the ALJ asked the VE the following hypothetical:

Q     Hypothetical: consider an individual with the claimant's age, education, and work history. This individual can lift 20 pounds occasionally; 10 pounds frequently; can stand and walk six hours in an eight hour day; can occasionally climb ramps and stairs; should never climb ladders, ropes, and scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; should not perform over head reaching with the right upper extremity. This individual can have only occasional exposure to extreme cold, extreme heat, vibrations, loud noise, and hazards. This individual can or retain capacity to understand, remember, and carry out simple tasks; can respond appropriately to occasional interaction with coworkers and supervisors so long as such activity does not include teamwork or over the shoulder supervision. This individual should have no, I'll say no, interaction with the general public, but is able to make an adjustment to occasional changes in the work routine. I'm assuming there would be no past work with this residual functional capacity?

A     Yes, your honor.

Q     Or hypothetical. Would there be other work?

A     Based on that hypothetical, yes, your honor; I would be able to list jobs for such a person. Under light work: mail clerk, non postal, DOT number 209.687-026 . . . assembler, DOT number 706.687-010 . . . and price marker, DOT number 920.687-126 . . . .

(Tr. at 45-46.)

Claimant's representative provided the following restrictions to the aforementioned hypothetical:

Q     Can you please change the hypothetical to read that the individual would never be able to interact with supervisors? How would that affect the jobs you listed?

A     No jobs.

Q     Okay. To the hypothetical the judge gave: if you added that due to panic attacks and symptoms of irritable bowel syndrome the individual would require occasionally unscheduled breaks outside of regularly scheduled breaks and lunch, totaling anywhere from 5 minutes up to one hour, or half an hour, excuse me; half an hour. How would that affect the jobs you listed?

A     If that was on a regular and consistent basis it would rule out those jobs.

Q     Would there be any work you could list?

A     No, sir.

Q     Finally, due to concentration issues with mental impairments, as well as distraction from tinnitus, could you add that the individual would be at least 15 perfect off task in the work place on a consistent basis?

A     That would also rule out jobs.

(Tr. at 48-49.)

The VE was present during the entire hearing (Tr. at 31.); she received copies of the pertinent evidence of record prior to giving her testimony, and she was advised to bring this material with her to the hearing according to the letter dated July 22, 2014 which notified her of the hearing. (Tr. at 164.) The VE was capable of summarizing Claimant's work history and categorizing same. (Tr. at 44-45.) The ALJ found that "[b]ased on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. at 23.)

It is also important to recall that the RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. § 404.1546.

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

> Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Fourth Circuit recognized that "remand may be appropriate...where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (Citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

Social Security Ruling 96-7p[12] clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements.

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or *examining physicians or psychologists* and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work. (emphasis added.)

With regard to Claimant's mental impairments, the ALJ specifically found that he had moderate difficulties in social functioning because he "reported some difficulties with being around large groups of people." (Tr. at 15.) The ALJ then contrasted this with Claimant's report

---

[12] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 16, 2016, however, SSR 96-7p was in effect at the time of the decision, September 26, 2014.

of participating in youth sports, "even coaching his son's sports teams (Exhibit 4F)[13]." (Id.) The ALJ found Claimant had moderate difficulties in concentration, persistence or pace due to Claimant's self-report, as well as observations by Mr. Atkinson, and Claimant's VA records. (Tr. at 15, 16.) The ALJ contrasted this with Claimant's ability to participate in daily activities such as helping his children and driving a vehicle, and the normal findings of these functions by Ms. Spaulding. (Tr. at 15.) The ALJ further noted Drs. Capage and Hursey found Claimant had moderate limitations in social functioning, but only mild limitations in any other area. (Tr. at 16.) The ALJ found the moderate limitations supported by the medical evidence, but further noted that "more recent evidence" from the VA and Mr. Atkinson supported moderate limitations in Claimant's concentration, persistence and pace. (Id.) The ALJ also found that the VA records indicated that Claimant's mental status examinations were overall normal, though he had issues of non-compliance with prescription medication coupled with marijuana use. (Tr. at 19-20.) When compliant to treatment, it was reported that Claimant's anxiety disorder usually improved. (Tr. at 20.)

Moreover, the ALJ noted that Mr. Atkinson's consultative examination afforded Claimant with a GAF score of 47, without identifying "significant limitations in any particular area of functioning." (Id.) As mentioned *supra*, this opinion was given "[n]o weight" because the assessment of "serious symptoms"[14] was inconsistent with Mr. Atkinson's own clinical findings as well as with the entire medical record. (Tr. at 21.) The ALJ also noted Ms. Spaulding's findings

---

[13] The undersigned notes that reference is to a report Claimant made to a psychological examiner at the VA in June 2012: "He has coached sports for his children for the past five years. His son is on an all-star team and he is still able to see him daily by attending practices." (Tr. at 590.)

[14] This concerned Mr. Atkinson's assessment of a GAF score of 47, which includes, for example, suicidal ideation, severe obsessional rituals, frequent shoplifting, no friends, and inability to keep a job pursuant to American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 34 (4th ed. 2000). (Tr. at 21.)

of "moderate limitations in his ability to understand, remember, and carry out complex instructions and work related decisions, deal with the public, and coworkers and respond appropriately to usual work settings" as well as her finding that Claimant had "marked[] impair[ment] "to make complex work-related decisions and deal with supervisors." (Tr. at 20.) The ALJ acknowledged Ms. Spaulding's reasoning for the limitations due to Claimant's "affective instability, hyper vigilance, poor anger control and panic attacks". (Id.) The ALJ gave "[g]reat weight" to Ms. Spaulding's findings and opinions because she examined Claimant personally, reviewed his medical history, and she supported her findings "with explanation" that were consistent with the evidence of record, specifically with the VA records. (Id.)

Though giving "great weight" to the findings supporting Claimant's moderate limitations, specifically with his ability to deal with "complex issues and in dealings with others", the ALJ took note that the evidence of record indicated these problems were not so limiting, as Claimant's symptoms were relatively controlled when he was compliant with medications. (Tr. at 21.) "Great weight" was also given to the VA disability finding with respect to Claimant's mental impairments, namely, generalized anxiety disorder and depressive disorder, where the VA examiners did not find such impairments rendered Claimant unemployable. (Id.) The ALJ gave "partial weight" to the opinions provided by psychological consultants, Drs. Capage and Hursey, who respectively found Claimant should be limited to tasks with "low stress with no supervisory responsibilities and no fast-paced production requirements" and to tasks that were "simple, routine". (Id.) The ALJ explained, "[a]lthough the doctors assessed only mild limitations in maintaining concentration, persistence and pace, they did account for some degree of inability in this area by identifying limitations to simple, routine tasks in a low stress environment. The latter findings are consistent

with the medical evidence in its entirety and this decision as a whole." (Id.)

The ALJ also considered Claimant's testimony that he could not handle stress well, or concentrate throughout the day, but contrasted this with his report that he would throw baseballs with his son, take him to a local basketball court, play video games with him, and attend sporting events; Claimant admitted to helping with laundry, doing dishes, and caring for his children. (Tr. at 22.) The ALJ considered Claimant's work history in assessing his credibility: following his discharge from the military, "he participat[ed] in multiple jobs and attend[ed] college" which the ALJ found "raises questions as to whether or not his current unemployment is actually the result of a medical condition." (Id.)

From the aforementioned the hypothetical questions posed to the VE with regard to the RFC, even with the omission of that last sentence, may be harmless error as countered by the Commissioner (Document No. 9 at 15-17, *supra*), as it would appear from prior decisions in this District the same two jobs listed by the VE would have been named had that last sentence in the written RFC been included in the hypothetical question at the administrative hearing. The hypothetical questions in the case at bar did not leave out Claimant's abilities and limitations, therefore, the problems presented in the Walker case did not occur here, however, the undersigned finds that the VE's opinion in response to the hypothetical questions from the ALJ **did not** "*fairly set out all of Claimant's impairments*" as discussed *infra*. Walker, 889 F.2d at 50. (emphasis added). Nevertheless, the undersigned agrees with Claimant that it is not up to the Court to make assumptions about what the ALJ intended to contain in the RFC (Document No. 10 at 2.), and the undersigned will not attempt to decipher whether the last sentence in the RFC as contained in the decision (Tr. at 16, Finding No. 5.) was a typographic error or not. Therefore, the undersigned

agrees with Claimant that only by remand can the necessary corrections be made as a result of this error.

Claimant has also pointed out that the RFC assessment does not include limitations found by Ms. Spaulding, whose opinion the ALJ gave "great weight"; specifically, the ALJ did not provide for Ms. Spaulding's finding that Claimant had marked restriction in interacting appropriately with supervisors. Though it is true that the Regulations do not require the ALJ to adopt Ms. Spaulding's findings in their entirety, it is remarkable that Ms. Spaulding found Claimant had marked impairment in his ability to interact appropriately with supervisors; Claimant's representative specifically asked the VE what jobs would be available to an individual with such a limitation, and the response was "no jobs". (Tr. at 48.) Claimant's argument that the ALJ was wrong to exclude "the limitations posed to the vocational expert by the claimant's representative" because they were not supported by "credible evidence of record" (Document No. 8 at 12.) is right on point and has merit. The ALJ expressly found Ms. Spaulding's opinion was entitled to great weight because it was supported by the evidence. The Commissioner's argument that the check box form employed by State agency examiners in rendering medical source opinions, and Ms. Spaulding's "largely unexplained checkbox form" would be entitled to less weight (Document No. 9 at 19.) has no merit because this was not the case here: Ms. Spaulding *provided a handwritten* explanation for her finding Claimant's marked impairments. (Tr. at 816.)

From the foregoing, the ALJ failed to explain why she did not include Claimant's marked limitations as found by Ms. Spaulding when considering the RFC; this is the "lack of explanation" that requires remand. Mascio v. Colvin, 780 F.3d at 640. Accordingly, the undersigned finds that the Commissioner's decision is not supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's Motion for Judgment on the Pleadings (Document No. 8.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 9.), and **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order to allow the ALJ to correct the error in the residual functional capacity assessment, to explain why Claimant's marked limitations, as found by a State agency examiner, whose opinion was afforded great weight, did not have to be included in her residual functional capacity assessment, or to consider same in her residual functional capacity assessment.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106

S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: December 7, 2016.

Omar J. Aboulhosn
United States Magistrate Judge